IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL VEGA, | No. CIV S-07-0585-CMK |
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the consent of the parties, this case is before the undersigned for final decision on plaintiff's motion for summary judgment (Doc. 19) and defendant's cross-motion for summary judgment (Docs. 20 and 21).

/ / /

/ / /

/ / /

/ / /

## I. PROCEDURAL HISTORY

Plaintiff applied for social security benefits on November 28, 2003. In his application, plaintiff claims that disability began on December 7, 2002. Plaintiff was found to be disabled for a closed period but, due to medical improvement, was found not disabled after December 30, 2003. Plaintiff describes his impairments as follows:

> Mr. Vega continues to suffer from severe impairments which give rise to debilitating symptoms, including severe pain, which combine to preclude him from performing substantial gainful activity. He suffers from the following severe impairments: right knee pain, status-post patellar subluxation, inferior patellar tendinitis, chronic fibular head fracture, restrictive lung disease, asthma, allergies, obesity, and GERD. Mr. Vega is also illiterate in English, as well as Spanish, his language of origin. Mr. Vega's impairments cause severe limitations in his ability to function on a sustained basis necessary for full-time or continuous employment at any exertional level.

Plaintiff's claim was initially denied as to the period after December 30, 2003. Following denial of his request for reconsideration, plaintiff requested an administrative hearing, which was held on February 10, 2006, before Administrative Law Judge ("ALJ") Antonio Acevedo-Torres  In his May 10, 2006, decision, the ALJ made the following findings:

1.  The claimant met the insured status requirements of the Social Security Act as of December 7, 2002, the date the claimant became disabled;

2.  The claimant has not engaged in [substantial gainful activity] at any time relevant to this decision. . .;

3.  At all times relevant to this decision, the claimant has had the following severe impairments: obstructive and restrictive respiratory disease and right knee derangement. . .;

4.  From December 7, 2002, through December 29, 2003, the period during which the claimant was disabled, the claimant did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. . .;

5.  After careful consideration of the entire record, the undersigned finds that, from December 7, 2002, through December 29, 2003, the claimant was unable to perform even the minimal standing and walking involved in sedentary work due to his knee impairment;

///

6. From December 7, 2002, through December 29, 2003, the claimant was unable to perform past relevant work. . .;

7. The claimant was born on November 25, 1966, and was 36 years old on the alleged disability onset date, which is defined as a younger individual 18-44. . .;

8. The claimant is illiterate and is not able to communicate well in English;

9. The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity assessed for the period from December 7, 2002, through December 29, 2003, due to his severe standing and walking limitations which preclude the performance of even sedentary work. . . ;

10. From December 7, 2002, through December 29, 2003, considering the claimant's age, education, work experience, and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that the claimant could have performed. . .;

11. The claimant was under a disability, as defined in the Social Security Act, from December 7, 2002, through December 29, 2003. . .;

12. Medical improvement occurred as of December 30, 2003, the date the claimant's disability ended. . .;

13. Beginning on December 30, 2003, the claimant has not had an impairment or combination of impairments that meets or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. . .;

14. After careful consideration of the entire record, the undersigned finds that, beginning on December 30, 2003, the claimant has had the residual functional capacity to perform a narrow range of light work and full range of sedentary work that involves lifting no more than 20 pounds occasionally or 10 pounds frequently; standing or walking no more than two hours total in an eight hour work day; and climbing, balancing, stooping, crawling, crouching, or kneeling no more than occasionally; he should avoid exposure to concentrated levels of respiratory irritants;

15. The medical improvement that has occurred is related to the ability to work. . .;

16. Beginning on December 30, 2003, the claimant has been unable to perform past relevant work. . .;

17. Beginning on December 30, 2003, transferability of job skills is not material to the determination of disability due to the claimant's age. . .;

/ / /

/ / /

      18.     Beginning on December 30, 2003, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been able to perform a significant number of jobs in the national economy. . .; and

      19.     The claimant's disability ended on December 30, 2003. . . .

After the Appeals Council declined review on January 25, 2007, this appeal followed.

## II.  SUMMARY OF THE EVIDENCE

      The certified administrative record ("CAR") contains medical records from the following sources:  (1) records from Folsom Orthopedic Surgery covering the period from December 2002 through November 2003 (Exs. 1F and 2F, CAR 99-181); (2) records from Manzanita Medical Center covering the period from January 2002 through November 2003 (Ex. 3F, CAR 183-206); (3) records from Antelope Physical therapy covering the period from April 2003 through December 2003 (Ex. 4F, CAR 208-72); (4) report and residual functional capacity assessment dated December 30, 2003, by agency consultative physician Corazon C. David, M.D. (Exs. 5F and 6F, CAR 273-83); (5) records from Mercy San Juan Hospital covering the period from December 2002 through May 2004 (Ex. 7F, CAR 285-94); (6) records from Pulmonary Medicine, Infectious Disease, and Critical Care Consultants covering the period from February 2002 through June 2004 (Ex. 8F, CAR 296-352); (7) records from Joseph T. Marino, M.D., covering the period from August 2003 through August 2004 (Ex. 9F, CAR354-67); (8) records from Jose R. Sanchez, M.D., covering the period from November 2003 through October 2004 (Ex 10F, CAR 369-419); (9) report of right knee MRI dated March 28, 2003, from Sacramento MRI Center (CAR 422); (10) report of right knee MRI dated September 26, 2003, from Open System Imaging (CAR 420-21); (11) report and residual functional capacity assessment dated October 28, 2004, by agency consultative physician (Exs. 11F and 12F, CAR 423-31); (12) records from Mercy San Juan Hospital dated December 22, 2004 (Ex. 13F, CAR 433-39); (13) records from Joseph T. Marino, M.D., covering the period from February 2004 through

November 2005 (Ex. 14F, CAR 61); and (14) records from U.C. Davis Health System covering the period from May 2005 through January 2006 (Ex. 16F, CAR 471-98).

Because the primary issue in this case is whether there was medical improvement in plaintiff's right knee impairment as of December 30, 2003, the court will focus on those records just before and after this date. Further, as discussed below, while plaintiff states that he is disabled due to asthma, he does not raise any arguments in his motion for summary judgment relating to the ALJ's findings regarding asthma. Therefore, the court does not focus on records from Pulmonary Medicine, Infectious Disease, and Critical Care Consultants or Dr. Marino, who treated plaintiff's asthma.

## 2003

An MRI of the right knee was performed on March 28, 2003, at Sacramento MRI Center. Test results revealed trace effusion, edema, bursitis, and tendinitis.

Physical therapist Gregory Rice examined plaintiff's right knee on April 1, 2003, and reported that plaintiff was able to complete 50% of a squat secondary to pain, that flexion of the right knee was 124 degrees and extension 0 degrees. The therapist's treatment plan called for physical therapy.

Plaintiff underwent a right knee arthroscopic chondroplasty on June 13, 2003, performed by Dr. Guilfoy of Folsom Orthopedic Surgery. Dr. Guilfoy reported that the procedure went well and stated that plaintiff would begin weight-bearing assisted with a brace. On June 26, 2003, Dr. Guilfoy reported that plaintiff was doing well two weeks following surgery on his right knee.

A July 21, 2003, note from the physical therapist indicates that right knee extension was 11 degrees and flexion 69 degrees. The therapist indicated that plaintiff reported a significant amount of pain and could not perform a quadricep extension.

///

///

On August 27, 2003, the physical therapist reported that, while plaintiff's progress had been slow, he had improved his range of motion of the right knee from 11 degrees extension and 69 degrees flexion to full extension and 117 degrees flexion. The therapist observed that plaintiff "is able to walk without assistive device with fairly normal pattern."

On September 23, 2003, Dr. Guilfoy prepared a follow-up treatment note. On physical examination of the right knee, Dr. Guilfoy observed:

> He has puffy edema over the area of the infrapatellar tendon, with some minimal tenderness. He has significant difficulty with active extension. His quadriceps measurements are done at 5 and 15 cm above the superior pole of the patella. These demonstrate a deficit at 5 cm of 2.5 cm, and at 15 cm, there is a 6 cm difference.

A second MRI of plaintiff's right knee was performed on September 26, 2003, at Open System Imaging. The report of this test revealed "abnormal thickening of the patellar tendon at its insertion site on the inferior pole of the patella, consistent with tendinitis or chronic tendinosis."

On October 2, 2003, Dr. Guilfoy of Folsom Orthopedic Surgery prepared a progress note. Dr. Guilfoy reported very slow progress "rehabbing from an infrapatellar tendon repair done in June." The doctor concluded that plaintiff "could be released to light duty, as long as it were sitting work only."

By November 14, 2003, plaintiff continued to make slow progress with physical therapy. The physical therapist reported that, while plaintiff complained subjectively of his knee "giving out," he was objectively "tolerating more regular weightbearing activities." Plaintiff was able to perform leg presses to 145 pounds bilaterally and to 70 pounds with the right leg.

Dr. Sanchez performed a new patient consultation and examination on November 14, 2003, for treatment incident to an injury on December 7, 2002. The doctor provided the following history:

> At the time of the injury, the patient was working for a moving company. His job description was that of a mover. On the date of the injury, he was unloading cubicle panels. The panels are used in big offices for cubicles.

> He was using a dolly that held about 10 of them, for a total weight of about 150 pounds, moving it down a ramp with a high grade. The patient was being helped by a co-worker. The co-worker let go of the dolly and the patient was holding on to it to avoid dropping the cargo. This resulted in his knee locking and twisting, and ended up having a patellar dislocation, by his description. He states he let go of the dolly and had a spontaneous reduction of the patella.
>
> He was then seen at Mercy San Juan emergency room where x-rays were unremarkable. He was told to follow up with his primary care physician. The patient follows up at the Manzanita Medical Clinic with Dr. Berchan. He eventually underwent an MRI of the right knee, which revealed some abnormalities. I do not have that report. Based on the findings, he underwent arthroscopic surgery on May 23, 2003, by Dr. Guilfoy. The diagnosis was patellar subluxation, patellar tendinitis. The patient underwent right knee arthroscopy, chondroplasty, open debridement patellar tendon, and lateral release. The patient has been in physical therapy for nearly four months and he does not feel that it is helping him. His current complaint is that of weakness and instability of the right knee.

On physical examination of the right knee, Dr. Sanchez reported:

> On exam of the knees, on the right knee, there is moderate amount of swelling in the right knee. There are well-healed portals as well as a well-healed vertical scar over the mid patella. A small effusion is noted. No crepitus is felt. Range of motion at the right knee for extension is 76 degrees and flexion is 108 degrees. Lachman and McMurray tests are negative. Anterior and posterior drawer signs are negative. There is moderate amount of pain while doing these maneuvers.

Dr. Sanchez completed a "Certificate of Disability" in which he stated that plaintiff could return to sedentary work as of November 15, 2003. He recommended continuation of physical therapy.

On December 1, 2003, plaintiff reported to Dr. Sanchez that his right knee pain was worse with cold weather. On examination, Dr. Sanchez noted a moderate amount of swelling, small effusion, and well-healed ports. Anterior and posterior drawer signs were negative. He noted that there was no hyper-laxity of the lateral collateral ligaments, although plaintiff reported pain during the testing maneuver. Lachman and McMurray tests were negative. Dr. Sanchez recommended continuation of physical therapy.

/ / /

/ / /

/ / /

On December 29, 2003 – which the ALJ concluded was the last day plaintiff was disabled due to his work injury – Dr. Sanchez performed a physical examination of the right knee and reported the following findings:

> . . . The right knee continues to have a small amount of swelling, especially over the suprapatellar tendon. An effusion is noted. Range of motion of the knee reveals lack of 7 degrees of full extension. Flexion is 58 degrees. Anterior and posterior drawer signs are negative. There is no hyper-laxity of the lateral collateral ligaments. Lachman and McMurray signs are negative.

Dr. Sanchez reported that plaintiff could return to "semi-sedentary" work and that plaintiff "can be considered Permanent and Stationary as of today."

On December 30, 2003 – the first date on which the ALJ concluded plaintiff was no longer disabled – agency consultative physician Corazon C. David completed a review of plaintiff's medical records and provided a residual functional capacity assessment. Dr. David concluded that plaintiff is "capable of sedentary w/ post. limitations and environmental precautions."

### 2004

Plaintiff was seen by Dr. Sanchez on January 9, 2004. The doctor reported that plaintiff "had an accident today" when he was "sitting on the toilet and when he got up his right knee buckled." Dr. Sanchez observed that range of motion of the right knee was "about 5 degrees short." No other testing was performed due to acute pain. Dr. Sanchez stated plaintiff could return to semi-sedentary work.

On January 26, 2004, Dr. Sanchez prepared a "Primary Treating Physician's Permanent and Stationary Report" in which he summarized plaintiff's medical records to date and reported on a current physical examination. The doctor stated that the report was being provided "as the patient's condition has become either permanent and stationary or reached

/ / /

/ / /

maximum medical improvement." On examination of the right knee, Dr. Sanchez noted:

> . . . There is a small effusion noted as well as tenderness to the right lateral aspect of the patella. No crepitus is felt. Anterior and posterior drawer signs are negative. Lachman and McMurray signs are negative. Range of motion for extension is 21 degrees short of full extension. Flexion is 90 degrees.

Dr. Sanchez concluded that plaintiff could perform semi-sedentary work only.

On February 26, 2004, Dr. Sanchez opined that plaintiff would not benefit from any further physical therapy. Instead, he recommended a self-directed aqua therapy program (i.e., swimming) at a gym and use of a stationary bike.

On April 22, 2004, Dr. Sanchez noted on physical examination that extension of the right knee was full and flexion was 85 degrees, an improvement since March 2004 when the doctor observed 60 degrees extension of 58 degrees flexion. By October 12, 2004, flexion was 105 degrees and extension was only 5 degrees short of full range of motion. Dr. Sanchez continued to recommend only semi-sedentary work.

The record contains a report and residual functional capacity assessment dated October 24, 2004, by an agency consultative physician. This doctor did not conduct an examination. The doctor concluded that plaintiff was limited to semi-sedentary work. However, the doctor also noted that plaintiff was making progress at the gym and suggested that more than semi-sedentary work may be appropriate. As to postural limitations, the doctor opined that plaintiff could occasionally climb, crouch, balance, crawl, stoop, and kneel.

### III. STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to

support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence. See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive. See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## IV. DISCUSSION

In his motion for summary judgment, plaintiff raises three claims of error. Specifically, plaintiff argues: (1) the ALJ improperly rejected the opinion of his treating physician, Dr. Sanchez, without providing legally sufficient reasons for doing so; (2) the ALJ improperly rejected his testimony as not credible without providing legally sufficient reasons for doing so; and (3) given plaintiff's non-exertional limitations, the ALJ improperly applied the Medical-Vocational Guidelines ("Grids") at 20 C.F.R., Part 404, Subpart P, Appendix 2, in determining disability.

/ / /

/ / /

/ / /

/ / /

### A. Evaluation of Medical Opinions

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional. See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987). The least weight is given to the opinion of a non-examining professional. See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether: (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record. See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict. See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995). A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence. See Lester, 81 F.3d at 830. This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding. See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989). Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional. See Lester, 81 F.3d at 830-31. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. See id. at 831. In any event, the Commissioner need not give weight to any

conclusory opinion supported by minimal clinical findings. See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

In this case, plaintiff argues that the ALJ "erred in rejecting the opinions of Dr. Sanchez, Mr. Vega's treating physician. . . ."[1] Specifically, plaintiff contends that the ALJ failed to give specific and legitimate reasons for rejecting Dr. Sanchez' opinions provided after December 29, 2003 – the date on which the ALJ concluded plaintiff's disability ended due to medical improvement. As to Dr. Sanchez, the ALJ stated:

> Medical records from Jose Sanchez, M.D., and physical therapy records show that the claimant had gained additional strength and flexibility in his knee by December 30, 2003, thus resulting in medical improvement (Exhibits 1F, 10F).
>
> * * *
>
> The record shows that by December 30, 2003, the claimant's knee condition was permanent and stationary. Jose Sanchez, M.D., a treating source, originally released the claimant to perform sedentary work but later referred to a "semi-sedentary" work status (Exhibit 10F). He appears to be using the workers' compensation term which contemplates that the individual can do work approximately one half the time in a sitting position, and one half the time in a standing or walking position, with a minimum of demands for physical effort, whether standing, walking, or sitting.
>
> However, the undersigned finds no basis for including sitting limitations in the claimant's residual functional capacity assessment. The claimant's primary disorder involved his knee which provides a basis for limiting standing and walking, but not sitting. . . .

The record reflects that, on November 14, 2003, Dr. Sanchez concluded that plaintiff could return to sedentary work. In the social security context, "sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. See 20 C.F.R. §§ 404.1567(a) and 416.967(a). There is no restriction to sitting (or, limitation on standing) for all or part of the time. In later assessments,

---

[1] Plaintiff also states that the ALJ erred with respect to the opinion of an agency examining psychologist. However, plaintiff does not allege disabling mental problems.

12

1  Dr. Sanchez concluded that plaintiff was limited to "semi-sedentary work."  As the ALJ noted, in
2  the California workers' compensation context, "semi-sedentary work" contemplates sitting half
3  of the time.  See Glass v. Workers' Compensation Appeals Board, 105 Cal.App.3d 297, 304 (2nd
4  Dist. 1980).  Specifically, on December 29, 2003, Dr. Sanchez concluded that plaintiff was
5  "permanent and stationary" and indicated a limitation to semi-sedentary work.  He also indicated
6  a limitation to semi-sedentary work on January 9, 2004, January 26, 2004, and April 22, 2004.
7  Thus, by changing his functional assessment from sedentary work to semi-sedentary work, Dr.
8  Sanchez essentially added a half-time sitting restriction.  Or, "semi-sedentary" can be seen as the
9  doctor's opinion that plaintiff was limited in his ability to stand.  The question is whether the
10 ALJ properly rejected this limitation.

11         In concluding that such a limitation was not warranted, the ALJ did not rely on the
12 record but, instead, relied on the reasoning that a knee problem does not impact plaintiff's ability
13 to sit.  While this is true, the ALJ's logic is flawed in that Dr. Sanchez did not conclude that
14 plaintiff had a limited ability to sit.  He concluded that plaintiff could only do work which
15 allowed for sitting half of the time.  In other words, Dr. Sanchez believed that plaintiff was
16 limited in his ability to stand.  The ALJ concedes that a knee problem would impact plaintiff's
17 ability to stand and walk.

18         Moreover, while agency consultative physician Dr. David concluded on December
19 30, 2003 – the apparent basis for the improvement date cited by the ALJ – that plaintiff could do
20 sedentary work, Dr. David added that plaintiff's ability to do sedentary work was eroded by
21 posterior limitations.  Thus, Dr. David appears to agree with Dr. Sanchez that plaintiff can do
22 something less than the full range of sedentary work, as that term is used in social security cases.
23 In addition, an agency consultative doctor concluded in October 2004 that plaintiff was limited to
24 semi-sedentary work.  To the extent the ALJ concluded that Dr. David opined that plaintiff could
25 do the full range of sedentary work, the ALJ does not discuss the conflict between such a
26 conclusion and the conclusions reached by Dr. Sanchez and the agency doctor in October 2004.

As to the October 2004 assessment by the agency doctor, defendant states in his brief that "[t]he ALJ also referenced the findings of the state agency medical consultant who opined that plaintiff should be able to perform sedentary work. (Tr. 21, 426-27)." Defendant is apparently basing this statement on the ALJ's reference in the hearing decision to Exhibits 11F and 12F at CAR 21. Exhibit 11F is the October 2004 assessment in which the agency consultative doctor concluded that plaintiff was limited to "semi sed" work. In Exhibit 12F, the doctor references "sed" work. However, this slight inconsistency in terminology is hardly conclusive evidence contradicting Dr. Sanchez' limitation to semi-sedentary work, especially in light of Dr. David's conclusion that plaintiff was limited to something less than the full range of sedentary work (i.e., sedentary work with postural limitations).

As to physical therapy records which do show slow improvement, they do not set forth any medical opinion on functional capacity which would tend to contradict Dr. Sanchez' opinion as plaintiff's treating physician. To the contrary, slow improvement supports Dr. Sanchez' opinion that plaintiff was still limited to less than sedentary work as of December 30, 2003, and beyond. In fact, Dr. Sanchez believed that physical therapy was not helping plaintiff, as evidenced by his recommendation that plaintiff switch to a self-directed swimming and weight training program at a gym.

The court notes that, with respect to the period of time before December 30, 2003, the ALJ concluded that plaintiff "was unable to stand or walk even two hours in an eight hour day and was therefore unable to perform even sedentary work." It appears from the record that this status was permanent and stationary as of December 29, 2003. Given Dr. Sanchez' conclusions after this date that plaintiff still had standing limitations, and given the agency consultative doctor's October 2004 similar opinion, the court questions whether plaintiff in fact experienced sufficient improvement to permit him to perform at least the full range of sedentary work. In particular, the court observes that Dr. Sanchez' objective findings on physical examinations before and after December 29, 2003, are substantially similar in that he consistently

found limited range of motion on flexion and extension of the right knee and concluded that plaintiff would not do the full range of sedentary work. While plaintiff's condition may indeed have improved at some point, it does not appear that it was improved as of December 30, 2003.

The court will remand this matter to the agency to re-consider the issue of medical improvement in light of Dr. Sanchez' findings and those of the agency consultative doctor in October 2004.

### B. Plaintiff's Credibility

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons. See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). An explicit credibility finding must be supported by specific, cogent reasons. See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990). General findings are insufficient. See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony. See id. Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing." See id.

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc). The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions. See id. at 345-47. In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms. See

Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

As to plaintiff's credibility, the ALJ stated:

> The claimant testified that he was disabled due to knee pain. He stated that he could stand 15 to 20 minutes at a time and sit 25 minutes at a time. He said he could lift 10 pounds. He said that his activities of daily living included going to the store with his wife, helping her with the household chores, and doing some cooking. He said that he experienced knee pain when he walked a lot. He spent time watching movies, listening to music, and talking to his wife. . . . He also said that he started using a cane the prior year. He said that he was afraid that he would fall in the shower. He also used a brace on his knee.
>
> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration, and limiting effects of these symptoms are not entirely credible beginning on December 30, 2003.
>
> * * *
>
> . . . The claimant testified that when he sat more than 20 minutes, he experienced inflammation and pain. However, this allegation is not credible because it is not supported by any evidence of record.
>
> The claimant also testified that he could lift no more than 10 pounds. But, Disability Determination Service sources concluded that he could lift 20 pounds occasionally and 10 pounds frequently. (Exhibits 11F, 12F). This is generally consistent with the fact that the claimant has no upper extremity impairment. By early 2004, he was in an exercise program including some weight resistance training. He was doing swimming, stationary bicycling, and other activities. These activities are consistent with the established residual functional capacity.

Based on this discussion, the ALJ found plaintiff's testimony credible as it related to limitations before December 30, 2003. As to his testimony regarding limitations after this date, it appears that the ALJ rejected plaintiff's testimony as to his limitations because: (1) it was "not supported by any evidence of record"; (2) he was in an exercise program by early 2004; and (3) he was doing "other activities," presumably activities of daily living.

///

///

///

Regarding the first reason – that plaintiff's testimony was not supported by the evidence – the court does not agree for the reasons discussed above. Specifically, Dr. Sanchez opined, based on objective findings and observations, that plaintiff could only do semi-sedentary work. This is entirely consistent with plaintiff's testimony that he could only stand for limited periods of time. Moreover, the state agency doctor agreed in 2004 that plaintiff could only do semi-sedentary work.

Regarding plaintiff's participation in an exercise program, the record reflects that this program was very conservative and included aqua fitness and some mild weight training to improve strength in the right knee. The record, however, does not indicate that plaintiff's exercise regime was extensive or consistent with the ALJ's conclusion as to plaintiff's capabilities after December 30, 2003.

Finally, as to "other activities" – presumably plaintiff's daily activities – plaintiff testified that he helps his wife with some of the household chores. What the ALJ does not mention, however, is that plaintiff testified at the hearing that he has problems completing chores due to knee pain. In particular, plaintiff stated that, while doing chores, he has to "take breaks in between." He stated that, if he's doing dishes, he has to rest after ten minutes of standing. In addition, plaintiff testified that he also has problems showering because he is afraid his knee "is not working." This testimony is consistent with a standing limitation.

On remand, the ALJ should reconsider the credibility of plaintiff's testimony regarding his limitations after December 30, 2003.

### C. **Application of the Grids**

The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about disability for various combinations of age, education, previous work experience, and residual functional capacity. The Grids allow the Commissioner to streamline the administrative process and encourage uniform treatment of claims based on the number of jobs in the national economy for any given category of residual functioning capacity. See Heckler v. Campbell, 461 U.S. 458,

460-62 (1983) (discussing creation and purpose of the Grids).

The Commissioner may apply the Grids in lieu of taking the testimony of a vocational expert only when the grids accurately and completely describe the claimant's abilities and limitations. See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983). Thus, the Commissioner generally may not rely on the Grids if a claimant suffers from non-exertional limitations because the Grids are based on strength factors only. See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b). "If a claimant has an impairment that limits his or her ability to work without directly affecting his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered by the Grids." Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(d), (e)). The Commissioner may, however, rely on the Grids even when a claimant has combined exertional and non-exertional limitations, if non-exertional limitations do not impact the claimant's exertional capabilities. See Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

In cases where the Grids are not fully applicable, the ALJ may meet his burden under step five of the sequential analysis by propounding to a vocational expert hypothetical questions based on medical assumptions, supported by substantial evidence, that reflect all the plaintiff's limitations. See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995). Specifically, where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the ALJ is required to obtain vocational expert testimony. See Burkhart v. Bowen, 587 F.2d 1335, 1341 (9th Cir. 1988).

In this case, the ALJ applied the Grids to conclude that plaintiff's residual functional capacity for the full range of sedentary work and narrow range of light work allowed him to perform jobs which existed in the national economy. For the reasons discussed above, however, the court concludes that the ALJ erred in concluding that plaintiff had the ability as of December 30, 2003, for at least sedentary work. Specifically, this conclusion does not properly

account for the medical evidence indicating a standing limitation consistent with semi-sedentary work.  It also does not properly account for plaintiff's testimony.

On remand, the ALJ should reconsider whether there are jobs plaintiff can perform given his functional capabilities.  It may be necessary to obtain vocational expert testimony.

### V.  CONCLUSION

For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and/or further findings addressing the deficiencies noted above.

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (Doc. 19) is granted;
2. The Commissioner's cross motion for summary judgment (Docs. 20 and 21)  is denied;
3. This matter is remanded for further proceedings consistent with this order; and
4. The Clerk of the Court is directed to enter judgment and close this file.

DATED: April 30, 2008

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE